## WESTERN NAT. BANK OF HEREFORD v. STEELE et al.

### No. 3368.

Court of Civil Appeals of Texas. Amarillo.

Jan. 21, 1931.

Rehearing Denied March 4, 1931.

Carl Gilliland, of Hereford, for appellant.

Morgan, Culton, Morgan & Britain, of Amarillo, for appellees.

RANDOLPH, J.

This suit was instituted by the appellant bank in the district court of Deaf Smith

county, as plaintiff, against appellees George H. Guinn and M. L. Steele as defendants. From an adverse judgment the plaintiff appeals.

On June 4, 1918, the plaintiff, in the district court of Deaf Smith county, recovered a judgment in cause No. 1122, entitled the Western National Bank of Hereford v. George H. Guinn, against the said George H. Guinn, for the sum of $6,669.87, with interest and costs. An execution was duly issued on said judgment on the 25th of February, 1919, which was returned by the sheriff of that county nulla bona.

On the 17th of May, 1928, M. L. Steele was the owner of certain steers which he sold to the said Guinn for the sum of $52.50 per head. At the time of the sale of said steers, a note was executed by Guinn to Steele for the sum of $3,000; $2,500 of this sum was the down payment on the purchase price of the steers and $500 was for cash advanced by Steele for Guinn to buy feed for the steers. The balance of the purchase money was $21,000. In May of the same year Steele wrote Guinn and inclosed him a note for $21,000 for his signature. It took the $21,000 note and $2,500 of the $3,000 note to make the total purchase price for which Steele sold the steers, and Steele testifies that he did not include the entire purchase price in the $21,000 note because Guinn had told him he would pay the $2,500 and take up that note. Steele then suggested to Guinn that as he could not pay the $2,500 note, they had better rewrite the mortgage, but Guinn said to just let it go for a day or two and that he was going to have to have another $500 to pay for feed. Steele then loaned him $500 and took his note for that sum. On May 17, 1928, Guinn executed a chattel mortgage upon the following described steer cattle, to wit: 413 dehorned white face steer yearlings; 35 head dehorned white face heifer yearlings. This mortgage was given to Steele to secure him in the payment of the $21,000 note and contained other provisions which will be noticed later.

The mortgage describes a $21,000 note here in controversy and also contains this provision:

"Whereas, party of the first part may desire hereafter to procure from party of the second part further loans of money from time to time, which loans, if consented to and made by second party, may be evidenced by the promissory note or notes of the said first party to the said second party or order;

"Now, Therefore, it is expressly agreed that all of the indebtedness so as aforesaid now existing, or which may at any time hereafter be created and outstanding as hereinbefore recited, with the interest thereon, shall be equally secured as a first and prior lien upon all and singular the cattle, live stock, chattels and personal property hereinbefore described, and that said security and lien shall extend, apply and continue as to any renewal or renewals or extensions of said notes which may be made by consent of the second party and which may be evidenced by the execution of a new note, or notes in place of the original notes."

These steers included in the mortgage were located in a pasture operated by Guinn west of the town of Hereford.

The note for $3,000, which includes the $2,500 down payment, and the sum of $500 advanced by Steele to Guin to buy feed, was incorporated with a further sum of $1,500 advanced by Steele, and all such sums were renewed and placed into a note for $4,500, which is one of the notes here in controversy.

The steers described in the mortgage, and which were the same steers sold by Steele to Guinn, were sold by Guinn to one Wilkinson, who appears to have been purchasing them for Lee Bivins.

The bill of sale executed by Guinn in the transaction with Bivins was delivered to Steele by Guinn pending the delivery of the cattle and the payment by Bivins of the purchase price. Subsequent to these transactions the plaintiff had an alias execution issued on the judgment in its favor in cause No. 1122 against Guinn and same was placed in the hands of the sheriff of Deaf Smith county. Whether or not this execution was levied upon the steers is a crucial point in determining whether or not the plaintiff was entitled to require the defendant to marshal securities. Hence, we will now give the material evidence bearing upon that question.

The sheriff of Deaf Smith county testified, in part:

"After I received the execution I drove out to Mr. Guinn's place and got there about 11:30 o'clock. He was not there, and I stayed at the camp about an hour and he still didn't come home, and then I went out in the south pasture and I counted the cattle. I first drove back into the north pasture and didn't find any steers. I found a bunch of heifers up there. I went back to the south pasture and counted 390 head of steers and then drove back to the camp, and went over to his son's house and made inquiry about him, and he said he had gone to Friona. Then I went south to the little school house and I met him there. I told him my business there. I don't know that I read the execution to him but I showed it to him. I found some steers out in the pasture and counted them. About 390. That is all the steers I saw there. That is all of them. I did not pen them up. I did not drive them around the pasture. I do not know whether they are the steers that Mr. Guinn had bought from Mr. M. L. Steele along about February, 1928, or not.

"I did not see Mr. Guinn before I counted the steers. I saw him afterwards, and I never saw the steers after I saw Mr. Guinn. I

told him, Mr. Guinn, that I would like to make arrangements to leave them there, and he said that they were Steele's cattle, and that he had nothing to do with them. I did not go and put somebody in charge of the cattle after that— I never saw them any more.

"When I returned to Hereford I went to Carl Gilliland's office and told him word for word what Mr. Guinn had said and he said that he would make the returns himself, and I left the execution in his office. I never made any returns on the execution as I remember of. I did not put the typewriting under the caption 'Sheriff's return,' and I never signed it as I know of, and the return is not signed by me. I never made any return into court myself, as I remember of.

"Q. Did Mr. Guinn tell you anything about selling the cattle or contracting for them, with Lee Bivins? A. No, he said that the cattle had been sold. I do not know how the cattle were branded. Mr. Guinn told me that I could leave the cattle in his pasture; it seemed to be satisfactory to just leave them stay there. These cattle were all in the inclosure there. I couldn't see that they were all in one brand; I noticed that the first cattle we struck had that brand and the rest of them, and I did not know for sure that they were the cattle until I drove over south of there. The cattle I counted were on Guinn's ranch. They were in one inclosure, the south pasture of Guinn's place.

"After I had the conversation with Guinn we separated and I came back to Hereford and took the execution to your (Gilliland's) office. I don't know if you told me that you could not make a complete return on the return until after I sold the cattle. When I remember being said there in your office is that I went into conversation with you and I told you just what I had done and you said you would make my returns; and you, at that time, from what I told you, wrote this (witness referring to a part of the typewritten portion of the returns on the execution) on it, and said that that was part of the return, and that it would be finished when the cattle were sold."

The sheriff's returns referred to are as follows:

"Sheriff's Return.

"Came to hand the *11th* day of *September, 1928*, and executed the *11th* day of *September, 1928*, by *levying on and taking into my possession in Deaf Smith County, Texas, as the property of the defendant, Geo. H. Guinn four hundred ten head of white faced dehorned steers, which were yearlings in the spring of 1928 and branded (giving brand) on the left thigh. Located about thirty-five miles west of Hereford.*"

The typewritten portions being italics, and the remaining portions being printed, except the brand, and it was made with ink; and the part of the typewritten portion referred to began with the words, "levying on and taking into my possession," and ending with the words "and located about thirty-five miles west of Hereford."

"Q. You knew at the time that I wrote this on the return; you knew what was on it? A. At the time; you did not write nothing, but you took it down on a piece of paper. It was getting late.

"Q. Was I not sitting there in the front room of my office and I called my stenographer and she wrote this? A. No; I don't think so; because we went ahead; I knew some words that was passed between Mr. Guinn and myself that I said took place out there, that I would not have said before a lady. I gave you the number of the steers and the description of the steers; we went into a conversation; just what took place, you said it was all right; that you would make my return. As I remember, you wrote it down with a pen or pencil.

"Q. You had not finished executing the writ up that time; You had just done part of it? A. Yes sir.

"Q. And your returns were not ready to be completed? A. No, I guess not."

"Q. Did you intend to sell these steers when you came back to town? A. I intended to do just what Carl Gilliland told me.

"Q. Did he tell you to sell them? A. No sir.

"Q. He told you to go out and get them? A. He told me to go out there and to execute that writ; that execution, and to do it that day, or right away.

"Q. Nothing was ever said to you about selling these steers? A. No; that really was not said; what was said about selling,—we all understood the cattle were sold and that they just meant to let that sale go on through. I cautioned them that morning, if I levied on these cattle, about where I would put these cattle. I did not agree to pay Guinn any pasturage for the cattle from the day I counted them. I never offered to pay him anything. I intended to go right ahead right there with what that thing said to do (witness referring to the execution read in evidence). They never called on me to do anything else. There was something said between me and Mr. Gilliland in reference to an indemnity bond. I asked Carl Gilliland if he had his bonds made and he said no, that if I had to have a bond that the Western National Bank of Hereford would make the bond, and it has never made a bond as I know of.

"Q. Would you have gone out there and taken possession of these cattle and sold them; without an indemnity bond? A. Mr. Gilliland guaranteed if I had to make the bond that they would make it; no sir, I would not have done that."

"These steers were in the south pasture. They were yearling steers. After I got back to town, nothing was said direct to me at all about them. I thought the thing was settled. I did not advertise the steers for sale under the execution, but left them there. The date the execution was delivered to me was the day I went out there and did what I did do toward making the levy, but didn't really know the date it really was, and couldn't say that that was the day it was issued. After they commenced talking to me I would not have sold the cattle unless an indemnity bond had been given to me. That was after I went out there.

"Q. You never called on me to give an indemnity bond? A. Yes sir, only that one day, Mr. Gilliland.

"Q. I said that if you wanted an indemnity bond I would give it any time you demanded it? A. You told me, Mr. Gilliland, that the Western National Bank would. Then I went on and did what I did do toward levying the writ. I talked to Mr. Guinn about those steers after I went out there and saw him there, and told him about the steers I had levied upon. He did not tell me that they were the steers he had sold Lee Bivins. He said that they were Mr. Steele's steers. That they were sold to Henry Wilkinson, and I don't know whether these same steers were ever delivered to Lee Bivins, or not."

It was also shown by the evidence that there were steers in the same pasture that belonged to other parties.

The plaintiff claiming it had a lien on the steers by reason of the levy above testified to, Bivins, the purchaser, demanded some security or an agreement for his protection in the paying of the purchase money, and for that reason an agreement was entered into by the various parties concerned, to wit: The Western National Bank of Hereford by G. A. F. Parker, president, George H. Guinn, and M. L. Steele by S. A. L. Morgan, agent. By the terms of this agreement, Lee Bivins was to pay, and did pay, to Steele when the steers were delivered to him the sum of $205, to McFarland and Wilkinson (their sales commission) and to M. L. Steele the sum of $18,950, and the balance of the consideration he was to hold as stakeholder in accordance with said contract then executed. The contract provided for Bivins to hold the balance of the money subject to the following clause thereof:

"It is further agreed by and between all parties hereto that in case the heirs or legal representatives of the said C. S. Hart, (who died after said contract for the purchase of said heifers was entered into, and before the consummation thereof), should carry out and perform said contract and pay for the said heifers, the said payment shall be made to the said M. L. Steele. And in case they should fail to do so, then the said Steele shall sell said heifers on the market, at the market price, and the price for which they are sold shall be paid to him, the said Steele. And if the Bank is correct in its contention as above recited, that the said Steele should marshal its security on the said heifers and apply the proceeds of the sale of them to the payment of the said $21,000.00 note before going onto and selling the said steers for the payment of the said $21,000.00 note, then that the said Steele shall pay to the said Bank, to be credited on its said judgment against the said Guinn, the said amount for which the said heifers are finally sold, whether the sale be a consummation of the said contract entered into between the said Guinn and the said C. S. Hart, or whether the sale be one made by the said Steele at the market price of said heifers, as hereinabove provided.

"It being also agreed by and between the parties hereto that the title to the said heifers shall, on the execution of this agreement, pass to, vest in, and be held by the said M. L. Steele for the aforesaid purposes, subject however, to the said contract made by the said Guinn and the said Hart.

"It is understood by and between all parties that neither the said Steele nor the said Bank waives their respective contentions as to whether or not the said bank has the right to compel the said marshaling of said securities by it, and hereinabove set out; and this agreement on the part of said bank, that the entire $21,000.00 net shall be paid out of the proceeds of the sale of the said steers to the said Bivins, is made in consideration of the agreement on the part of the said Steele and the said Guinn that the said proceeds of the sale of the said heifers shall be paid to the said bank and applied on its said judgment in case the said bank under its said levy has a legal right to require the said Steele to so marshal his said securities and sell the said heifers, and require the proceeds of the sale of said heifers to be first applied to the payment of his said $21,000.00 note before selling said steers for the said purpose, or before causing the proceeds of the sale of said steers to be applied on the payment of said $21,000.00 note; and it is contemplated by and between the parties hereto that when the proceeds of the sale of said heifers are paid to the said Steele the said Bank shall institute suit against the said Steele in a court of competent jurisdiction or said Steele shall institute suit against said Bank, in order to judicially determine the respective rights of the parties to the said proceeds of the sale of said heifers."

As to the fund held by Lee Bivins, at his death, which occurred shortly afterwards, his estate paid over to Steele under an agreement betwen the parties the money held by Lee Bivins as stakeholder; Steele to become liable for its payment provided the judgment of the court should find the plaintiff to be entitled to a marshaling of the securities.

There is one clause in the contract providing that Bivins should hold the balance of the purchase money, which will be quoted here also, because material to a question before us:

"And whereas, thereafter on the 11th day of Sept., 1928, the Clerk of said Court duly and legally issued an alias execution out of said court on said judgment, directed to the sheriff or any constable of said Deaf Smith County, commanding him that of the goods and chattels, lands and tenements of the said George H. Guinn, he cause to be made said sum of $6,-669.87 with interest thereon at the rate of ten per cent. per annum and the said sum of $5.-30 costs, which said execution was on the said 11th day of September, 1928, delivered to Claude Benton, the Sheriff of Deaf Smith County, Texas, and was by him on said date duly and legally executed in Deaf Smith County, Texas, by levying on and taking into his possession as the property of the said defendant George H. Guinn, 410 head of white faced dehorned steers, which were yearlings in the Spring of 1928 (giving brand), located about 35 miles west of Hereford, which said steers are now in the possession of said Sheriff under said levy."

It is apparent from the evidence of the sheriff that he never took actual possession of the steers under the claimed levy. He only rode out among them, counting them. He could testify only to a few head having the brand on them; he did not drive them or segregate them from the other steers in the pasture. He made no arrangements to put any one in charge as caretaker, made no arrangements for their continued pasturage. When he told Guinn he would like to make arrangements to leave the steers there, Guinn told him that they were Steele's cattle and he had nothing to do with them.

Can a levy made on live stock be made by the sheriff riding out among them and counting them and then leaving them where he found them, without making any arrangements with anyone to take charge of them? We think not. The sheriff's acts did not constitute the taking into his possession of the steers as required by article 289, R. C. S. If he had taken the steers into his actual possession, he certainly abandoned that possession, when he failed to make any arangements for their continuance under the levy.

This court has heretofore, in the case of Osborn v. Paul, 27 S.W.(2d) 572, discussed the requirements of a valid levy, and we refer to that case and the authorities therein cited to support our holding that there was no valid levy.

The appellant relies on the case of Burch v. Mounts (Tex. Civ. App.) 185 S. W. 889, to support its contention that the levy was a legal levy. That case has several distinctive features which render it not in point in this case. In the first place, in that case the sheriff took actual possession of the steers by driving them up out of the creek where he could count them, but he returned later and took them to another pasture. We think this distinction is sufficient; but be that as it may, we do not feel that we ought to extend the holding in that case any further so as to include as a valid levy the acts of the sheriff in this case.

The appellant contends that the agreement between the parties that Bivins was to hold the money as stakeholder by the recital, "which said execution was on the 11th day of September, 1928, delivered to Claude Benton, the Sheriff of Deaf Smith County, Texas, and was by him on said date duly and legally executed in Deaf Smith County, Texas, by levying on and taking into his possession as the property of said defendant George H. Guinn, 410 head of white faced dehorned steer yearlings," etc., estopped the defendant Steele from attacking the legality of the levy upon the steers. In reply to this, the defendant Steele expressly pleads as to the contract, as follows:

"That the real agreement, reached and arrived at between the plaintiff and the defendant, at the time the said contract was made, was that said sale to Lee Bivins for the sale of the said steers and the sale of the heifers referred to in the said contract to C. S. Hart or the estate of C. S. Hart, be consummated, and that after the payments and the commissions and the said note for $21,000.00 held by this defendant be paid; that the balance of the money received from the sale of said steers and heifers be held by the stakeholders referred to therein, subject to whatever liens or equities plaintiff and this defendant, or either of them, might have to the said cattle; in other words, that such proceeds for said cattle and the existing liens and equities of the plaintiff and the defendant be enforced against said money in the hands of the stakeholders interested in enforcing said liens and equities against said cattle.

"That there was no agreement on the part of the said M. L. Steele, to waive any rights, nor was there any agreement on the part of the plaintiff to waive any rights, and if said contract as claimed by plaintiff contains any such provision, said provision does not reflect the agreement and the facts and it renders said contract ambiguous and susceptible of construction requiring proof to disclose its real purpose and meaning.

"That if said contract should perchance be construed to have meant an apparent waiver by this defendant of any claim that the plaintiff did not hold a valid execution lien against said steers, that such agreement was without consideration; in this, that the plaintiff lost no rights by virtue of the making of said contract, that any rights it had against said steers or heifers, or against this defendant were not given up or surrendered by virtue of the making of said contract.

"That in truth and in fact, the plaintiff had no rights as against said steers or the said heifers, or any interest, to require this defendant to surrender the proceeds received from the sale of said heifers, as claimed by the plaintiff in its petition herein filed, for this reason, that no levy had been made of any execution upon the said 413 head of steers as represented by plaintiff to the defendant and as recited in the introductory clauses in the said contract.

"That the Sheriff of the said County never took the said cattle into his possession, nor did he ever interfere with the possession of the said George H. Guinn with said cattle; that no act had been proclaimed by the Sheriff amounting to a trespass, but that said execution, if any return was made of such, or by such officer, showing him levying upon the said cattle, and no lien, right, title or equity of any kind or character was ever fixed or established by the plaintiff against said cattle, and the rights being asserted by the plaintiff at the time of the signed date of the contract attached to the plaintiff's petition, marked "Exhibit B", to this defendant and the said Lee Bivins, were not founded upon any valid lien, equity, right, title or estate, and there was in fact no basis for any bona fide claim on the part of the plaintiff to a lien against the said cattle.

"That by virtue of the facts as hereinafter set forth, said contract should be construed to mean that the rights of the parties were held in statu quo, and that the money, to-wit: the sum of $4,620.00 now in controversy, be held in lieu of said cattle until the rights of the plaintiff and this defendant be litigated.

"This defendant further represents that in the making of this said contract this defendant through his attorney S. A. L. Morgan, of Amarillo, accepted the statement of the attorney of record for the plaintiff, i. e., that a valid levy of said execution had been made on the said 413 head of steers; and believed said representation to be true, and but for his belief in said representation, which he afterwards learned was unfounded and without foundation in fact, this defendant through his attorney would not have entered into said contract; by reason of which this defendant in no event should be bound by any recitation contained in said contract, by which the plaintiff seeks to bolster up its claim to the said cattle."

The defendant abundantly sustained this pleading by the evidence, and the trial court in his findings of fact with reference to said clause in the stakeholder contract found as follows:

"I find that in introductory clause in said contract it was recited that the execution delivered to Claude Benton, Sheriff, was on the 11th day of September, 1928, 'duly and legally executed in Deaf Smith County, Texas, by levying on and taking into his possession as the property of said defendant said Geo. H. Guinn, 410 head of white face dehorned steers which were yearlings in the spring of 1928, and branded on the left thigh.' I find that the context of said contract however, discloses no intention on the part of the defendants M. L. Steele and Geo. H. Guinn to waive any rights against the plaintiff and that the context of said contract discloses no intention on the part of the plaintiff to waive any right against the defendants M. L. Steele and Geo. Guinn but that it was the intention of all parties to said contract merely to substitute said respective sums of $2920.00 and $1700.00 for the steer yearlings and the heifer yearlings heretofore referred to pending the outcome of the litigation of the respective claims of the plaintiff and the said M. L. Steele under the claim of plaintiff that it had an execution lien on said steers and that the claim of said Steele that he had a chattel mortgage lien on said steers superior to any execution lien, if any. And I find that if said context in said contract was intended to waive and admit that there was a levy of an execution by the sheriff that the same was of no force or effect as no execution lien can be established by the agreement of parties or by the waiver of levying an execution but the same must be levied as provided by the statutes of this State."

There being abundant evidence to sustain this finding, this court has no power to set same aside. Hence the question as to whether or not a legal levy was made is not concluded by the signing of said agreement.

But should we be in error in this holding, there is another proposition urged by the defendant Steele for our consideration that we think is decisive of this appeal.

It is evident, and we think beyond controversy, that the note for $2,500, which was later incorporated in the $4,500 note, was a part of the purchase money paid for the cattle. It will be remembered that $500 of the $4,500 was loaned to Guinn by Steele to buy feed. This was loaned to him after the execution of the mortgage but before the delivery of the steers. The $1,500 making up the balance of the $4,500 note was loaned to Guinn after the execution and delivery of the mortgage.

■ The facts in the case establish that the plaintiff bank had, some years before the transaction of the taking of the lien by defendant Steele, obtained a valid judgment against the defendant Guinn, and after the steers then owned by Steele had been sold by him to Guinn, and after the sale of the same steers to Bivins and Hart, and pending the delivery of same to Bivins, had the attempted levy made. Therefore, the plaintiff, regardless of the levy, is not in position of innocent creditor in good faith.

■■ The defendant Guinn having delivered to defendant Steele the bill of sale which he had executed to Bivins and which was to

be turned over to Bivins when he received the steers and paid the purchase money, the evidence clearly shows Guinn's intention to transfer the rights under said bill of sale and all payments thereunder to Steele. While this bill of sale was a written instrument, it was not necessary that it be registered to entitle Steele to all interest in the proceeds of the sale. First National Bank v. Harkness, 42 W. Va. 156, 24 S. E. 548, 32 L. R. A. 408.

Where proceeds of a contract were assigned, such assignment is not a chattel mortgage and is superior to a writ of garnishment or, as in this case, a writ of execution. Hall v. Terra Cotta Co., 97 Kan. 103, 154 P. 210, L. R. A. 1916D, page 361, Ann. Cas. 1918D, 605.

An assignment of a debt or fund secures it against attachment or garnishment for a debt of the assignor. 5 Tex. Jur. 39, § 31.

The sale by Guinn to Bivins, as stated above, was evidenced by a part of the purchase money being paid, the residue to be paid by Bivins upon delivery of the steers. This being true, the delivery by Guinn to Steele of the bill of sale from him to Bivins with the intention on his part of vesting in Steele the right to collect the residue from Bivins (the cash payment having been turned over to Steele) was an assignment of such fund and record or other notice was not required to have been given to the plaintiff.

There are other questions raised and discussed by both parties in their briefs, but as our decision of the questions above discussed disposes of the case, we do not deem it necessary to discuss them here.

We therefore affirm the judgment of the trial court.